IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

HOSAM MAHER SMADI,
Plaintiff,

v.

JOSHUA MICHAELIS and
WILLIAM TRUE, III,
Defendants.

Case No. 19–CV–00217–JPG

## MEMORANDUM OPINION AND ORDER

This is a prisoner civil-rights case. Before the Court is Defendants Joshua Michaelis and William True, III's Motion to Dismiss and Alternatively Motion for Partial Summary Judgment. (ECF No. 19) [hereinafter "Defs.' Mot."]. Plaintiff Hosam Maher Smadi responded. (ECF No. 21). For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' Motion.

### I.   PROCEDURAL & FACTUAL HISTORY

Smadi is a Jordanian national convicted of "attempted use of a weapon of mass destruction" in 2009 and sentenced to 24-years' imprisonment. (Compl. 4, 15, ECF No. 2). From 2015 to 2020, he was incarcerated at the U.S. Penitentiary in Marion, Illinois ("USP Marion"), within this District. (*Id.* at 19; Notice 1, ECF No. 29).

Smadi is also a Sunni Muslim with "deeply, and sincerely, held religious beliefs." (*Id.* at 20). Thus, he only eats *halal* food, meaning food that is processed and prepared in accordance with Islamic dietary laws. (*Id.*). Kosher food, for example, would "not meet the requirements . . . as it is prepared in a manner inconsistent with Islamic law, and, contains ingredients, like wine, which are prohibited by Islamic law." (*Id.*). Moreover, Smadi "adheres to the Salafi interpretation of Islam," which further restricts his diet to "meat prepared in accordance with the Salafi"

tradition.[1] (*Id.*). This "require[s] that Smadi not eat food prepared in a container, including a microwave, that has been used to cook pork, and/or, other forbidden . . . food, unless said container be ritually purified in a manner not readily available in a prison environment." (*Id.*).

"Prior to April 9, 2018, Smadi communicated with Michaelis" (the warden of USP Marion) and True (the food-service administrator) and "notified them of his sincerely held religious beliefs . . . and, the related dietary requirements, and, asked them to make a halal meal available to him." (*Id.* at 24). They told him "that Kosher meals were available, and, that they were not otherwise required to accommodate [his] sincerely held religious beliefs." (*Id.* at 24–25).

Smadi then filed a grievance requesting halal meals:

> Smadi does not receive Halal meat at mealtimes, while Judaic inmates are accommodated with Kosher meat. Kosher meals are not compatible with Smadi religious believe [sic]. Smadi request non-Kosher halal meat at meals pursuant to the RFRA [and the First and Fifth Amendments].

(*See* Request for Administrative Remedy (June 14, 2018), ECF No. 19-2 at 126). It was denied by the General Counsel in October 2018:

> This is in response to your Central Office Administrative Remedy Appeal wherein you request the Food Service Department at USP Marion accommodate your religious dietary needs as a Muslim by providing you with certified Halal food items.
>
> We have reviewed the documentation related to your appeal. Based on this review, we concur with the manner in which the Warden and Regional Director addressed your concerns. Program Statement 5360.09, Religious Beliefs and Practices, section 18, part a, states: "The Bureau [of Prisons ("BOP")] provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu." The

---

[1] "Salafism . . . is a largely pietistic, apolitical sect favoring a literalist reading of the Quran and Sunna, and whose adherents seek to 'live like the companions of the prophet' during the seventh century in Mecca and Medina." Christian Joppke & John Torpey, Legal Integration of Islam: A Transatlantic Comparison 27 (Harv. Univ. Press 2013).

religiously certified meals, in conjunction with the no-flesh menu, currently being served are adequate to meet their religious dietary requirements.

We advise you that the [BOP] is currently evaluating the feasibility of providing certified Halal prepackaged meals that meet the BOP's specifications. In the interim, you may continue to purchase in the Commissary. Additionally, you are allowed to purchase Halal certified entrees through the Special Purpose Order [] procedures . . . .

(Admin. Remedy Resp. (Oct. 22, 2018), ECF No. 19-2 at 129).

Smadi also filed a grievance requesting a new microwave:

[The Communications Management Unit ("CMU")] is an isolated special unit where limited access to wide range activities [sic], including food service kitchen. Most of the time food is served cold by cart, therefor[e] it's important to have microwave for this unit in the hall eating area. Please consider this request to provide microwaves in food area "chow hall" so we can heat our cold served food, or just replace microwaves in CMU as they broke. CMU has a separate budget and must be able to provide microwaves for our food.

(*See* Request for Admin. Remedy (Aug. 31, 2018), ECF No. 19-2 at 132). It was denied by the warden and the regional director in October 2018:

This is in response to your Administrative Remedy . . . wherein you request microwaves to heat your food that is being served cold from food carts. In addition, the Administrative Remedy addresses replacing microwaves as they break and a separate budget for CMU.

The Trust Fund Branch in Central Office does not provide funding for microwaves. Program Statement 4500.11, Trust Fund Manual, Ch 3.3, states "consumable items and medical items sold shall complement, not supplement, diet and medical care provided to the inmate population." All food items sold in the commissary can be prepared via the hot water dispensers provided in the housing units or the items can be consumed without heating. Therefore, a microwave is not required to heat items purchased and microwaves will not be replaced.

> In regards to your request that the CMU receives a separate budget, the institution receives one budget and the amount is distributed between the different cost centers within the institution. Also, the Food Service department will examine the dining procedures in CMU and address any issues with food temperature that does not meet policy guidelines.

(Admin. Remedy Resp. (Oct. 2, 2018), ECF No. 19-2 at 135; Admin. Remedy Resp. (Oct. 31, 2018), ECF No. 19-2 at 137).

In December 2018, Smadi sued Michaelis and True in this Court alleging that their "refus[al] to reasonably accommodate [his] need for halal meals, and, to provide [him] with a separate microwave in which to prepare such meals," violated rights secured by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1 *et seq*. (*Id.* at 27). He seeks "[n]ominal, compensatory, and, punitive damages, as well as appropriate injunctive, and, declaratory relief for each count . . . ." (*Id.* at 28).

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Rules of Civil Procedure thus "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 322. So "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Even still, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III.   LAW & ANALYSIS

The Supreme Court recently clarified that RFRA authorizes suits for money damages against federal officials, preserving Smadi's pursuit for monetary relief. That said, he failed to exhaust his administrative remedies for the microwave issue: The grievances that he submitted could not put the defendants on notice that he sought a separate microwave to accommodate his religious beliefs. Even so, Smadi met his burden of showing that his right to dietary accommodations was clearly established at the time of the challenged conduct, thus defeating the defendants' qualified-immunity defense.

#### A.   Smadi May Pursue Monetary Damages Under RFRA.

The Court deferred ruling on the defendants' Motion until the Supreme Court decided *FNU Tanzin v. Tanvir*, — S. Ct. 550 —, 2020 WL 7250100 (2020). There, the Court clarified that "RFRA provides, as one avenue for relief, a right to seek damages against Government employees." *Id.* at *4. In other words, "RFRA's express remedies provision permits litigants, when appropriate, to obtain money damages against federal officials." *Id.* at *5. The defendants' argument that Smadi may not pursue monetary damages under RFRA is therefore moot.

#### B.   Smadi Did Not Exhaust His Administrative Remedies for the Microwave Claim.

The Prison Litigation Reform Act ("PLRA") requires "that inmates complaining about prison conditions exhaust prison grievance remedies before initiating suit." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citing 42 U.S.C. § 1997e(a)). "[T]he benefits of exhaustion . . . include allowing a prison to address complaints about the program it administers before being subjected

to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Id.* at 219. "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211. Even so, "failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).

"The level of detail necessary in a grievance to comply with the grievance procedure will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 218. "When the administrative rulebook is silent," however, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). For federal prisoners, federal administrative law provides a four-step exhaustion process:

> ***Step 1:*** The inmate must first attempt to resolve the issue informally. 28 C.F.R. § 542.13.
>
> ***Step 2:*** If the inmate is unable to resolve the issue informally, the inmate must submit a formal "Administrative Remedy Request" . . . [to] the warden of the institution where the inmate is located. 28 C.F.R. § 542.14.
>
> \*     \*     \*
>
> ***Step 3:*** If the inmate is dissatisfied with the Warden's response to the Administrative Remedy Request, the inmate may appeal the Warden's decision to the appropriate Regional Director. 28 C.F.R. § 542.15.
>
> \*     \*     \*
>
> ***Step 4:*** If the inmate is dissatisfied with the Regional Director's response to the appeal, the inmate may appeal once more to the BOP's General Counsel. 28 C.F.R. § 542.15. . . . An appeal to the BOP General counsel is the final step in the BOP administrative review process.

(Nelson Decl. 2, ECF No. 19-2 at 2).

The defendants contend that it is "clear that [Smadi] failed to exhaust his administrative remedies on the microwave issue." (Defs.' Mot. at 15). For support, they rely on a declaration submitted by Ryan Nelson, a senior BOP attorney "familiar with the BOP administrative remedy program." (Nelson Decl. at 1–2). According to Nelson, Smadi's "administrative remedy requesting a microwave be placed in the dining area of his unit to heat up cold food . . . does not mention Hala[l] meals . . . ." (*Id.* at 4). Nelson also noted that "Smadi submitted a clarified remedy indicating he wanted microwaves put in the CMU dining area so the inmates could heat food that was cold." (*Id.*). Moreover, Nelson revealed that although "Smadi submitted an appeal of this remedy to the Regional Director, . . . [n]o further remedy submission . . . [was] received by the BOP." (*Id.* at 4–5). In other words, the defendants contend that Smadi failed to exhaust his administrative remedies on the microwave issue for two reasons: (1) Smadi requested a microwave because his food was cold, not because it was required by his religious beliefs, as he argues here; and (2) Smadi failed to appeal the regional director's response to the BOP's general counsel.

In response, Smadi argues that his separate halal-meals grievance *implied* "the need for a separate microwave": "[T]he term 'halal', as understood by Smadi, and, based upon the Islamic jurisprudence of figures like ibn-Qudamah al-Magdisi, encompasses more than the slaughter of meat, but, also the preparation of the food in general, including its preparation in an uncontaminated vessel, such as a microwave." (Pl.'s Resp. at 3). The Court disagrees.

Smadi's halal-meals grievance did not also suffice to alert the prison of his request for a new microwave based on religious concerns. The grievance did not refer to Smadi's definition of *halal* or the Salafi interpretation. Instead, Smadi specifically requested *halal* meat, suggesting the way it is processed and prepared. True enough, the "[b]urden is on the defendants" to support their exhaustion defense. (*Id.* at 4). They did not, however, have to "ask[] Smadi to define the term

*halal*, or, to clarify the parameters of his request"—he said what he wanted, "Halal meat at mealtime." (*Id.*). That's a far cry from requesting a microwave.[2] What's more, Smadi's actual grievance requesting a new microwave said nothing about his religious beliefs—the old microwave broke, so he wanted a new one to "heat [his] cold served food." Again, Smadi failed to put the defendants on notice that he was requesting a microwave to satisfy a sincerely held religious belief. At any rate, that grievance is not properly before the Court because Smadi did not appeal the regional director's decision to the general counsel. In short, Smadi failed to exhaust his administrative remedies for his purported request for a separate microwave to accommodate his religious beliefs. Even so, the Court will proceed with Smadi's exhausted halal-meals claim and not "dismiss the entire action" just because the microwave claim "is not properly exhausted." *Jones*, 549 U.S. at 220.

### C. The Defendants Are Not Entitled to Qualified Immunity on the Halal-Meals Claim.

"As recognized at common law, public officers require . . . protection to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). Because of this *qualified immunity*, government officials are shielded "from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[3] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818).

---

[2]  Smadi also suggests that a court order from the District of Colorado in a different case put the defendants here on notice that Smadi was seeking "a religious services microwave." (Pl.'s Resp. at 4). That case, however, is too far removed to have placed the defendants on notice of Smadi's desire for a new microwave; and it is not binding precedent establishing a clearly established right.

[3]  Citing *Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) ("*Rasul II*"), the defendants assume that "[t]he defense of qualified immunity applies not only to constitutional claims, but also to claims brought for alleged violations of RFRA." (Defs.' Mot. at 11).

The plaintiff bears the burden of proving that the rights were clearly established. *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017). He need not refer to "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. In the Seventh Circuit, "we look to controlling Supreme Court precedent and our own circuit decisions on the issue. In the absence of controlling precedent, we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Jacobs v. City of Chi.*, 215 F.3d 758, 767 (7th Cir. 2000) (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)).

Here, Smadi argues that the defendants' refusal to provide him with halal meals violated rights clearly established by RFRA, which prohibits the Government from "substantially

---

In *Rasul v. Myers*, 512 F.3d 644, 668 (D.C. Cir. 2008) ("*Rasul I*"), the D.C. Circuit held that nonresident alien detainees are not protected " 'person[s]' under RFRA." There, four nonresident alien detainees at a military facility in Guantanamo Bay, Cuba sued the former secretary of defense and ten senior U.S. military officials, "claim[ing] they suffered physical and psychological trauma as a result of their detention at Guantanamo" in violation of RFRA, among other things. *Id.* at 651. The court, however, analyzed the Supreme Court's Fourth and Fifth Amendment jurisprudence as well as the text of RFRA and concluded that "[b]ecause the plaintiffs are aliens and were located outside sovereign United States territory at the time their alleged RFRA claim arose, they do not fall with [RFRA's] definition of 'person.'" *Id.* at 672.

The Hon. Janice Brown wrote a concurrence in which she stated that she "would have no trouble concluding" that the defendants were *also* "protected by qualified immunity" because "[t]here was strong reason for" the defendants to believe that they were not violating a clearly established law. *See id.* at 676 (Brown, concurring). That said, she recognized that "[t]here is some uncertain[t]y about whether qualified immunity is available to federal official sued under RFRA." *Id.* at 676 n.5. The plaintiff-detainees simply "*assumed* that qualified immunity [was] available and . . . thus waived any argument to the contrary." *Id.* (emphasis added).

The D.C. Circuit's opinion in *Rasul I* was ultimately vacated by the Supreme Court on other grounds, *Rasul v. Meyers*, 129 S. Ct. 763 (Mem.) (2008); but when the case returned, the D.C. Circuit's analysis of the RFRA claim remained unchanged: Nonresident alien detainees "are not among the protected 'person[s]' for whom RFRA created a private right of action," *Rasul II*, 563 F.3d at 528. In a footnote, however, the court added, "In the alternative, for the reasons stated in Judge Brown's initial concurring opinion, defendants are entitled to qualified immunity against plaintiffs' RFRA claim." *Id.* at 528 n.6.

To be sure, the D.C. Circuit concluded that qualified immunity applies to RFRA claims, but it did so in dicta without significant analysis. *See also FNU Tanzin*, 2020 WL 7250100, at *5 n.2 ("Both the Government and respondents agree that government officials are entitled to asserts a qualified immunity defense when sued in their individual capacities for money damages under RFRA."). That said, Smadi, like the plaintiffs in *Rasul*, assumes that qualified immunity is available. Like the D.C. Circuit, therefore, this Court will refrain from making an unnecessary constitutional decision and proceed on the assumption that the doctrine of qualified immunity applies to claims brought under RFRA.

burden[ing] a person's exercise of religion . . . ." 42 U.S.C. § 4200bb-1(a). "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A); *see id.* § 2000bb-2(4).

For support, Smadi points to the Seventh Circuit's decision in *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2007), where the court "held that it was a violation of the First Amendment and the [Religious Land Use and Institutionalized Persons Act ("RLUIPA")] for prison officials to deny an inmate's request for a non-meat diet on the ground that his religion does not require such a dietary religion," *Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009) (citing *Koger*, 523 F.3d at 797–800), *abrogated on other grounds*, *Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019). There, the plaintiff-inmate was a member of the Ordo Templi Orientis ("OTO") religion, which "may, from time to time, include dietary restrictions as part of his or her personal regiment of spiritual discipline." *Koger*, 523 F.3d at 794 (internal quotation marks omitted). The inmate— who would not eat "meat or anything on his meal tray that had touched meat"—requested "a non-meat diet as part of his religious practices." *Id.* at 793. Although the prison offered "vegan and lacto-ovo vegetarian" meals that "would have satisfied [the inmate's] request," officials refused to give him either unless he complied with a prison "policy requiring [him] to verify his membership in OTO" with "a 'letter' from the religious organization sent directly to him." *Id.* at 794–96. Because the OTO "religion lacks clergy members as traditionally understood," the Seventh Circuit concluded that the prison's "clergy verification requirement was responsible for rendering [the inmate's] religious exercise effectively impracticable," thus "impos[ing] a substantial burden on [his] religious exercise." *Id.* at 799. The court also found that the officials were not entitled to qualified immunity because the inmate asserted a clearly established "right to religious

accommodation for a religious practice demonstrably associated with, though not compelled by his religion." *Id.* at 802.

The defendants, on the other hand, contend that it was not until February 2019 that the Seventh Circuit held in *Jones v. Carter*, 915 F.3d 1147, 1150 (7th Cir. 2019), "that prisoners have a clearly established statutory right to specifically requested Halal meats . . . ." (Defs.' Mot. at 12). Indeed, the Court recognized earlier in this case that a prison's "refusal to provide [an inmate] with a halal diet, unless he purchased the halal food items himself[,] places a substantial[] burden on the exercise of his religion . . . ." (Mem. & Order 4, ECF No. 8 (citing *Jones*, 915 F.3d at 1150)).

For all that, the Court agrees with Smadi that his right to a halal meal was clearly established at the time of the challenged conduct. "RFRA was designed to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby*, 573 U.S. 682, 706 (2014). Although *Koger* is not directly on point, the Seventh Circuit still recognized the right to accommodation for an inmate's idiosyncratic dietary restrictions associated with his religion. *See Koger*, 523 F.3d at 802–803. The same was true in *Jones*, where the inmate had to purchase halal meat from the prison commissary to supplement his diet because his interpretation of Islam required regular meat intake—as here, the vegetarian kosher alternative wouldn't do. *Jones*, 915 F.3d at 1148. There too, the Seventh Circuit noted that "[w]hen the state forces a prisoner to choose between adequate nutrition and religious practice, it is imposing a substantial burden on his religious practice . . . ." *Id.* at 1150. The court also noted that two 2016 Supreme Court decisions "articulated a standard much easier to satisfy" than the *effectively impracticable* standard used in *Koger*: "After these recent cases, **there can be no doubt** that when the state forces a prisoner to give away his last dime so that his daily meals will not violate his religious practices, it is imposing a substantial burden." *Id.* at 1150 (emphasis added). Yet the Seventh Circuit noted that even before those cases,

"other circuits found that asking prisoners to pay daily for religious complaint diets was a substantial burden . . . ." *Id.* (collecting cases). Moreover, given that *Jones* came down less than a year after the challenged conduct here, the Court can say "with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.' " *Jacobs*, 215 F.3d at 767. In other words, the defendants are not entitled to qualified immunity.[4]

IV. **CONCLUSION**

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants Joshua Michaelis and William True, III's Motion to Dismiss and Alternatively Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

**Dated: Monday, December 21, 2020**

>    **S/J. Phil Gilbert**
>    **J. PHIL GILBERT**
>    **UNITED STATES DISTRICT JUDGE**

---

[4] This conclusion, of course, does not end the case: The defendants may still show that the burden placed on Smadi's exercise of religion was (1) to further a compelling governmental interest and (2) the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b).